IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
BANKRUPTCY DIVISION
DIVISION OF ST. CROIX

In re:                          )    Chapter 11
                                )
Sanitas Partners, V.I., LLC,    )    Case No. 1-16-bk-10005 (MFW)
                                )
            Debtor.             )

OPINION[1]

Before the Court is the Motion of Sanitas Partners, V.I.,
LLC (the "Alleged Debtor") to Dismiss the involuntary petition
filed against it and a request for an award of attorneys' fees,
costs, and damages.  Because the Court concludes that there is no
bona fide dispute about the claims of three of the petitioning
creditors, the Court will deny the motion to dismiss and enter an
order for relief against the Alleged Debtor.


I.   BACKGROUND

The Alleged Debtor is a limited liability company based in
the Virgin Islands that operates a solid waste transfer station
on the Island of St. Croix.  (Tr. 56-57.)  In 2010, the Alleged
Debtor entered into a contract with the Virgin Islands Waste
Management Authority (the "WMA") to design, build and operate the
transfer station.  (Tr. 56-58; Ex. 16 at ¶ 5.)  The transfer
station became operational in 2012.  (Tr. at 58; Ex. 16 at ¶ 6.)

---

[1]     This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052, as
incorporated by Rule 9013, of the Federal Rules of Bankruptcy
Procedure.

The Alleged Debtor subcontracted with Paradise Waste Systems, Inc. ("PWS") to operate the transfer station. Donald Moorehead ("Moorehead") indirectly owned 75% of PWS at the time. (Ex. 1 at 1.) The Alleged Debtor terminated its relationship with PWS on April 16, 2015. (Tr. at 47, 65-67.)

On June 13, 2016, Donald Moorehead ("Moorehead"), Highland Holdings, Inc. ("HHI"), and GEC, LLC (the "Original Petitioning Creditors") filed an involuntary bankruptcy petition against the Alleged Debtor. (Ex. 16 at ¶ 1; Ex. 14.)

On August 12, 2016, the Alleged Debtor filed its motion seeking dismissal of the involuntary petition and damages, fees and costs related thereto. (D.I. 18.) The Motion contended, inter alia, that the petitioning creditors were not qualified to file the petition because their claims were disputed.[2] (D.I. 18-2 at 2, 9-13.)

On September 1, 2016, Marco St. Croix ("Marco") filed a joinder in the involuntary petition. (D.I. 26; Ex. 16 at ¶ 3.) (Marco and the Original Petitioning Creditors are referred to herein as the "Petitioning Creditors".) After discovery was conducted, an amended involuntary petition was filed on February 3, 2017. (D.I. 39; Ex. 15.)

---

[2] The Alleged Debtor also contended that the involuntary petition was filed in bad faith. (D.I. 18.) It has subsequently stipulated that the petition was not filed in bad faith. (Ex. 16 at ¶ 4.)

The Alleged Debtor does not contest the claim of Marco in the amount of $68,416.28 and admits that $50,000 of the claim of GEC is not subject to dispute.  (Ex. 16 at ¶ 4.)

A trial was held on February 9, 2017, on the remaining issue of whether the claims of HHI (in the amount of $10,000) and Moorehead (in the original amount of $120,000) are subject to bona fide dispute as to amount or liability.  The parties filed post-trial briefs on March 3, 2017, and the matter is ripe for decision.

II.   <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this contested matter.  28 U.S.C. §§ 1334(b) & 157(b)(1).

III.  <u>DISCUSSION</u>

A.   <u>Legal Standard</u>

An involuntary petition must be commenced by "three or more entities, each of which is either a holder of a claim against such [alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $15,775 . . . ."  11 U.S.C. § 303(b)(1).  A bona fide dispute exists "[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as

3

to the application of law to undisputed facts . . . ." <u>B.D.W.
Assoc., Inc. v. Busy Beaver Bldg. Ctrs., Inc.</u>, 865 F.2d 65, 66
(3d Cir. 1989) (citation omitted).  "The existence of affirmative
defenses may suggest that bona fide disputes exist.  Pending
litigation strongly suggests, but does not necessarily establish,
the existence of a bona fide dispute." <u>In re Metrogate, LLC
f/k/a Advance Realty Grp., LLC</u>, No. 15-12593, 2016 WL 3150177
(Bankr. D. Del. May 26, 2016).

    The initial burden is on the petitioning creditors to
present prima facie evidence of the validity of their claims;
after which the burden shifts to the alleged debtor to show that
there is a bona fide dispute. <u>Id.</u> at *8.  However, the ultimate
burden of persuasion remains on the petitioning creditors. <u>In re
Soderberg & Schafer CPAS, LLC</u>, 441 B.R. 262, 264 (Bankr. N.D.
Ohio 2010).  In addition, "while a court is called upon to
determine the presence of a bona fide dispute, it is not called
on to resolve such dispute." <u>Crest One Spa v. TPG Troy, LLC (In
re TPG Troy, LLC)</u>, 793 F.3d 228, 234 (2d Cir. 2015).

    B.   <u>Is There a Bona Fide Dispute?</u>

    1.   <u>Moorehead's claim</u>

    Moorehead's claim is premised on a settlement agreement (the
"Agreement") among the Alleged Debtor, Moorehead, and PWS dated
May 7, 2015.  (Ex. 1.)  The Agreement resolved claims of
Moorehead and PWS that the Alleged Debtor had improperly

4

terminated the subcontract and dissolved their equity interests in the Alleged Debtor (Moorehead owned 5% and PWS owned 35% of the Alleged Debtor). (Id.) Pursuant to the Agreement, Moorehead agreed to transfer his ownership interest in the Alleged Debtor, PWS, and PWS's parent to the Alleged Debtor. PWS agreed to allow the Alleged Debtor to use its equipment and to deliver free and clear title to the equipment to the Alleged Debtor after PWS had received twelve payments under the Agreement. (Id.)

In exchange, under the Agreement, the Alleged Debtor agreed to make thirty payments to, or on behalf of, PWS (totaling $422,000) and certain payments to Moorehead (totaling $864,000) as set forth on Exhibit A to the Agreement. (Ex. 1 at Ex. A.) The payments (totaling $1,286,000) were conditioned on receipt by the Alleged Debtor of amounts due to it by the WMA, which were to be remitted to the Alleged Debtor's attorney, who would then pay Moorehead and PWS in accordance with the Agreement. (Ex. 16 at ¶ 8-10.)

In July 2015, however, the Alleged Debtor began factoring the WMA receivables to Capstone Business Funding, LLC ("Capstone"). (Ex. 16 at ¶ 13.) As a result of the factoring, WMA paid Capstone amounts it owed the Debtor and not the Debtor's attorney as required by the Agreement. (Exs. 1 & 2.)

Between May 7, 2015, and the original petition date of June 13, 2016, WMA paid the Alleged Debtor amounts owed to it for the

months of December 2014 through November 2015.  Under the
Agreement, $150,000 of those payments were supposed to have been
paid to Moorehead.  (Ex. 17.)  The Alleged Debtor only made two
payments to Moorehead (totaling $30,000) under the Agreement.
(Exs. 2, 3 & 17.)  Therefore, Moorehead contends that he has
presented a prima facie case for the validity of his claim that
the Alleged Debtor owes him at least $120,000.[3]  (Id.)

The Alleged Debtor contends that Moorehead's claim is in
bona fide dispute for two reasons.  First, it alleges that
Moorehead was in breach of the Agreement because the equipment
that the Alleged Debtor received under the Agreement was in poor
repair (despite the fact that the Alleged Debtor had paid PWS
over the years for maintenance of the equipment).  This
necessitated expenditures by the Alleged Debtor in excess of
$440,000 for repairs or for rental of replacement equipment to
avoid disrupting operations.  Second, in many instances, the
Alleged Debtor discovered that the equipment was not owned by PWS
which required the Alleged Debtor to pay in excess of $58,000 to
acquire title from the finance companies that did own it.  (Exs.
5 & 7.)

---

[3]    Between May 7, 2015, and the amended petition date of
February 3, 2017, WMA paid the Alleged Debtor amounts owed to it
for the months of December 2014 through June 2016.  (Ex. 16 at
¶ 11.)  Under the Agreement, $396,000 of those payments were
supposed to have been paid to Moorehead.  (Ex. 1 at Ex. A.)
Therefore, as of the amended petition date, Moorehead contends
that he is owed $366,000.  (Ex. 17.)

The Petitioning Creditors disagree.  Initially, they argue that the alleged breaches of the Agreement were, if at all, breaches of obligations of PWS, not Moorehead, under the Agreement.  PWS (not Moorehead) owned the equipment; PWS agreed to let the Alleged Debtor use it; and ultimately, it was PWS that was obligated to deliver title to the Alleged Debtor.  (Ex. 1 at 3.)

The Alleged Debtor contends, however, that Moorehead was the one who made the representations as to the equipment because he owned PWS and he signed the Agreement on behalf of PWS.  According to the Alleged Debtor, it is appropriate to pierce the corporate veil and treat PWS as Moorehead's alter ego.

The Court rejects the Alleged Debtor's argument that Moorehead was in breach of the Agreement because of the asserted breaches by PWS.  PWS was a separate legal entity from Moorehead and the corporate form is to be honored except in rare circumstances.  See, e.g., Gardener v. The Calvert, 253 F.2d 395, 398 (3d Cir. 1958).  On the record made at the hearing, there is no evidence to suggest that the corporate structure should be ignored.  This is especially true because the Agreement itself acknowledged the separateness of PWS and Moorehead by detailing their obligations in separate sections, providing for separate payments to each, and requiring signatures for each party.  (Ex. 1 at 3-5.)  The fact that Moorehead signed as President on behalf

of PWS does not mean that he assumed the obligation to perform
for PWS.

Even if the corporate veil could be pierced, the Petitioning
Creditors contend that neither Moorehead nor PWS breached the
Agreement. With respect to the contention that the equipment was
in poor repair, the Petitioning Creditors state that this is not
a breach because the equipment was sold in an "as-is" condition.

The Court agrees with the Petitioning Creditors. The
Agreement is clear that the equipment is being delivered "as is"
with no warranty as to its condition. (Id. at 3.) Therefore,
the claim of the Alleged Debtor for alleged repair/rental costs
in excess of $440,000 as a setoff against Moorehead's claim is
invalid.

Finally, the Petitioning Creditors note that under the
Agreement, PWS was not obligated to deliver title to the
equipment until after it had received the first 12 payments under
the Agreement. (Id. at 3.) This was to permit PWS to pay off
the financing on the equipment. (Ex. 6.) They argue that,
because the Alleged Debtor did not make those payments, PWS was
not obligated to deliver title. (Ex. 1 at 3.)

The Court again agrees with the Petitioning Creditors. The
Agreement is clear on PWS's obligation to deliver title:
"Upon receipt of the first 12 payments described above, PWS shall
transfer free and clear title to all equipment listed on Exhibit

8

B to [the Alleged Debtor]." (Id.) It is undisputed that the Alleged Debtor did not make the first 12 payments due to PWS. (Ex. 2.) Therefore, there was no obligation on the part of PWS (or Moorehead) to deliver free and clear title to the Alleged Debtor.

In addition, the Petitioning Creditors contend that, even if there were a breach, the Alleged Debtor never gave PWS or Moorehead notice of any breach (orally or in writing) or an opportunity to cure the breach. (Tr. 105.)

The Court agrees that the lack of any notice of default (to PWS or Moorehead) by the Alleged Debtor even in the face of calls, texts, and emails by them seeking payment under the Agreement, suggests that the Alleged Debtor did not really believe there was any default by them.

Consequently, on the record presented, the Court finds that there is no bona fide dispute raised by the Alleged Debtor to Moorehead's claim. Therefore, the Court concludes that he is a valid petitioning creditor under section 303(b).

2. HHI's claim

HHI's claim of $10,000 is premised on work done by its consultant, Edward Hayes, in preparing the Alleged Debtor's tax returns. (Tr. 24.) The Alleged Debtor admits that Hayes prepared its tax returns between 2009 and 2013. (Ex. 16 at ¶ 15.) However, neither HHI nor Hayes ever billed the Alleged

Debtor for that work until an invoice was sent on November 8, 2014. (Ex. 9.) The Alleged Debtor argues that it never agreed to pay for those services and believed that the services were an equity contribution by Moorehead (who owned HHI). (Tr. 84-85, 90, 25.) The Alleged Debtor also argues that Hayes did the work and there is no evidence that HHI paid Hayes for that work. Therefore, it contends that there is no proof that HHI has a claim against the Alleged Debtor for the tax preparation work done by Hayes.

The Petitioning Creditors argue that the work done by HHI, through Hayes, could not have been an equity contribution by Moorehead because the work was done for tax years 2009-2013 and Moorehead did not acquire an equity interest in the Alleged Debtor until 2012. Even then, the Petitioning Creditors argue, HHI had no obligation to provide tax services for the Alleged Debtor. (Tr. 90.) They further contend that the $10,000 claim is for only one year's worth of services. (Tr. 25, 92.) They dispute the Alleged Debtor's contention that HHI's claim was settled and released as part of the Agreement, noting that HHI was not a party to the Agreement. (Tr. 53; Ex. 1.) Finally, they assert that, even though the Alleged Debtor never listed the claim in its books and records, it never contested the validity of the debt. Instead, when asked for payment, the Alleged Debtor only said that it did not have the cash to pay it. (Id. at 29-30, 92.)

10

The Court agrees with the Alleged Debtor that there is a bona fide dispute about the validity of the HHI claim. There is no writing between HHI and the Alleged Debtor evidencing any agreement to perform tax services or to pay for those services. The services were allegedly performed over a four-year period without an invoice ever being sent. Further, Hayes performed the services, not HHI, and there is no evidence that HHI paid Hayes for the services he performed for the Alleged Debtor.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds there are three Petitioning Creditors whose claims are not subject to bona fide dispute. Accordingly, the Court will deny the Motion to Dismiss and request for damages and will enter an order for relief under chapter 11 against the Alleged Debtor pursuant to section 303(h) of the Bankruptcy Code.

An appropriate Order follows.

Date: March 17, 2017

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge