**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Sanitas Partners, V.I., LLC, | ) | Case No. 1-16-bk-10005 (MFW) |
| | ) | |
| Debtor. | ) | Rel Docs. 168, 170, 225, 226, 227, 230 |
| | ) | |

**MEMORANDUM OPINION**[1]

Before the Court is the Objection of creditor GEC, LLC ("GEC") to the claim filed by Capstone Business Funding, LLC ("Capstone"). For the reasons stated below, the Court will allow in part and disallow in part Capstone's claim.

I.  BACKGROUND

In April 2010, Sanitas (the "Debtor") executed a contract with the Virgin Islands Waste Management Authority (the "WMA") to design, build, and operate the St. Croix Solid Waste Transfer Station (the "SCTS Contract"). On June 13, 2016, several creditors including GEC, filed an involuntary chapter 11 petition against the Debtor. The Debtor filed a motion to dismiss the involuntary petition, which the Court denied on March 17, 2017. The case was subsequently converted to chapter 7 on August 7, 2017, and Adam Hoover was appointed as the trustee (the "Trustee").

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014(c).

During the gap period between the involuntary filing and the Court's denial of the Debtor's motion to dismiss the case, the Debtor assigned to Capstone a series of monthly accounts receivable owed to the Debtor by WMA (for the months of May, June, July, August, October, and November 2016). The Debtor and Capstone executed a separate Purchase and Sale Agreement ("PSA") for each WMA receivable assigned. For each PSA, Capstone and WMA executed a corresponding estoppel agreement under which WMA agreed to pay the factored invoices directly to Capstone.

Capstone's original proof of claim sought $826,935.71 as a secured claim based on: (i) $782,147.11 for accounts receivable purchased from the Debtor, (ii) $10,278.71 for legal fees in connection with Capstone's collection efforts, and (iii) $34,509.89 for a negative Working Capital Advance Balance (the "Reserve Account"). (Proof of Claim 9, Ex. A.)

On July 5, 2017, Capstone sued WMA in New York state court alleging an unpaid balance of $782,147.11 due on the factored accounts under the estoppel agreements. The parties settled the suit, pursuant to which WMA agreed to pay Capstone $450,000. (D.I. 170, Ex. O.) Under the settlement, Capstone released any cause of action that it could have alleged against WMA "their successors, principals, agents, insurers, employees, assigns, subsidiaries and/or subcontractors." (Id. at ¶ 6.)

As a result of that settlement, Capstone now asserts it is

owed $332,147.11 as the remaining amount of its accounts receivable claim, plus $49,822.07 as misdirected payment fees, $35,831.33 in legal fees, and $35,109.89 for the negative Reserve Account.  Capstone asserts that its entire claim is secured by a UCC-1 Financing Statement it filed on July 15, 2015, which lists "[a]ll assets of the Debtor" as its collateral.  (D.I. 225, Ex. T.)

On March 28, 2018, the Trustee filed an adversary proceeding against WMA.  (D.I. 151.)  In that action, the Trustee alleged that WMA owed the Debtors a total of $4,312,750, which included (i) $1,207,000 in unpaid service fees due to the Debtor under the SCTS that had not been factored; (ii) $780,000 in consequential damages caused by the Debtor being required to factor invoices to Capstone as a result of WMA's non-payment under the SCTS; and (iii) $2,325,750 for WMA's alleged wrongful termination of the contract in June 2017.  (Id. at ¶¶ 9, 10, & 11.)

On November 19, 2019, the Trustee filed a proposed settlement of its adversary proceeding against WMA which this Court granted on December 9, 2019.  (D.I. 191; D.I. 199.)  Under the settlement, WMA agreed to pay the Trustee $1,525,000 in satisfaction of all the Trustee's claims, which includes: (i) $1,351,036.93 in unpaid, unfactored invoices; (ii) $857,657.65 for "factoring losses" incurred as a result of WMA's chronic late payment of invoices; and (iii) $807,500 in lost revenue resulting

from WMA's alleged wrongful termination.  (D.I. 191 at 1-2; D.I. 226-2.)  The settlement funds are to be paid by WMA in installments.  (D.I. 191; D.I. 199.)

On December 20, 2018, GEC filed an objection to Capstone's proof of claim.  (D.I. 168.)  Capstone responded on January 4, 2019.  (D.I. 170.)  On March 13, 2019, the Court held a hearing on the objection and found that the dispute was conducive to rendering a decision based on the documentary evidence.  (D.I. 177.)  The Court directed the parties to file any additional exhibits they wished and a status report by June 15, 2019.  (Id.)  After an extension of time to complete discovery, the parties filed their additional responses and documents in late 2020.  (D.I. 225, 226, 230.)  The matter is now ripe for decision.

II.  JURISDICTION

The Court has subject matter jurisdiction over this contested matter as it involves the allowance of claims and the determination of a party's interest in property of the estate.  28 U.S.C. §§ 157(b)(2)(B) & (K), 1334.

The Court has the authority to enter a final judgment on this matter.  See, e.g., Stern v. Marshall, 564 U.S. 462, 499 (2011) (bankruptcy court has authority to enter a final order where "the action at issue . . . would necessarily be resolved in the claims allowance process").

4

III. DISCUSSION

   A.   Legal Standard

The filing of a proof of claim constitutes prima facie evidence of a valid claim. See 11 U.S.C. § 502(a); In re Catholic Diocese of Wilmington, Inc., 513 B.R. 639, 643 (Bankr. D. Del. 2014). Once an objecting party produces evidence sufficient to place the claim at issue, however, the claimant bears the ultimate burden of proving the validity of its claim by a preponderance of the evidence. In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992).

Here, Capstone filed a proof of claim and attached supporting documents. GEC objected, asserting that the PSAs were true sales of the receivables and, therefore, the Debtor is no longer liable to Capstone for the factored invoices. As a result, Capstone bears the ultimate burden of proving its right to payment from the Debtor's estate by a preponderance of the evidence.

   B.   Objections to Capstone's Secured Claim

      1.   Capstone's Settlement with WMA

GEC initially argues that Capstone's claim must be disallowed in full as a result of Capstone's settlement of its New York action against WMA, which GEC contends released any claim Capstone may have against the Debtor.

Capstone responds that the New York action only asserted

claims that it had against WMA under the estoppel agreements, not any claims it had against the Debtor. It notes that the Debtor was not a party in that case. Capstone also contends that its claims against WMA were based on the estoppel agreements it had with WMA, not the PSAs to which WMA was not a party. As a result, Capstone contends that no claims against the Debtor under the PSAs were released by its settlement with WMA.

The Court concludes that Capstone's settlement with WMA does not bar its claims against the Debtor. The Debtor was not a party to that suit and the Debtor is not a "successor, agent, insurer, employee, assign, subsidiary, or subcontractor" of WMA. Moreover, Capstone did not bring (and could not have brought) an action against WMA under the PSAs because WMA is not a party to those contracts. Therefore, Capstone's claim against the Debtor under the PSAs was not released by the Capstone settlement of its suit against WMA under the estoppel agreements.

### 2. Reserve Account Balance

Part of Capstone's claim is a claim for $35,109.89 based on the Debtor's alleged liability for a Reserve Account Capstone maintained in connection with the PSAs.

GEC objects to the Reserve Account claim asserting that Capstone has provided no documentation to support its purported capital advance loans or the Debtor's promise to pay any portion of the Reserve Account balance.

6

The Reserve Account claim consists of working capital advances Capstone allegedly provided to help the Debtor cover payroll and emergency expenses. Capstone asserts that the Reserve Account balance was to be paid by the assignment of invoice VIWMASF 1065 to Capstone. However, Capstone presented no evidence of an agreement to that effect and admitted that the parties did not execute a PSA for that invoice. (D.I. 225 at ¶ 31.)

The Court concludes that Capstone has failed to satisfy its evidentiary burden with respect to the Reserve Account claim. The terms of the PSA do not provide for working capital loans. (D.I. 170, Exs. A-F.) Further, Capstone concedes that there is no written evidence of an agreement or assignment of any invoice to cover Capstone's alleged Reserve Account balance. (D.I. 225 at ¶ 31.) Therefore, the Court will disallow Capstone's $35,109.89 Reserve Account claim.

### 3. Attorney's Fees

Capstone also asserts a $35,831.33 claim for attorney's fees incurred enforcing its right to payment on the factored invoices. Capstone contends that the Debtor agreed to reimburse those attorney's fees under Paragraph (k) of the PSA, which provides:

> (k) In the event it should become necessary for [Capstone] to enforce its rights hereunder against [Sanitas], or [WMA], [Sanitas] agrees that in addition to the amount for which [Capstone] is enforcing its rights, [Capstone] shall be entitled to receive up to [a] maximum of thirty three and one third (33 1/3%) of

7

> the amount for which [Capstone] is enforcing the rights as and for [Capstone's] attorney's fees therefore.

(D.I. 170, Exs. A-F at § k.)  Capstone alleges that it is entitled to the full amount of its attorney's fees, because the actual amount asserted is below the cap.

GEC argues that the Debtor never promised to pay legal fees incurred by Capstone in its collection efforts against WMA, as opposed to efforts to collect from the Debtor.

The Court concludes that the express language of the PSAs provides a basis for a claim for attorney's fees which Capstone may have incurred enforcing its rights against either the Debtor or WMA.  However, the Court finds that, while it was afforded the opportunity to submit documents in support of its claim for fees, Capstone failed to provide any documentation or other evidence that supports that claim.  (D.I. 177 at 3.)  Therefore, the Court will disallow Capstone's $35,831.33 claim for attorney's fees.

### 4.    Amounts Claimed for Unpaid Factored Invoices

Capstone argues that it has a claim totaling $332,147.11 for remaining amounts due to it under the factored invoices.

GEC asserts that Capstone assumed the credit risk of the factored invoices, which were sold without recourse to Capstone at 70% of face value.  It argues, therefore, that Capstone has no claim against the Debtor for those invoices, but only had a claim against WMA which it has settled and released.

Capstone responds that it has a claim against the Debtor for

payments which were due to Capstone but were misdirected to the Debtor by WMA.  Capstone relies on the PSAs which provide that Capstone is entitled to all funds due by WMA on factored invoices.  (D.I. 170, Exs. A-F at § o.)  The Debtor agreed to hold any payment it received on the factored invoices in trust and to remit those funds to Capstone within two business days.  (Id.)  Failure to forward any misdirected payments within five business days is a default under the PSAs, entitling Capstone to impose an additional charge of 15% of the misdirected funds.  (Id. at § o(ii).)  It contends that payments WMA made to the Debtor from September 2016 through June 2017 should have gone to Capstone for the factored invoices dated March through August, October, and November 2016, before WMA paid invoices due to the Debtor for later months.

GEC argues that the payments that Capstone asserts were misdirected were proper payment of invoices due to the Debtor from WMA which had not been factored to Capstone.  GEC further asserts that because WMA is a public agency operating under financial pressure, its payment decisions to pay the Debtor's invoices rather than Capstone's older invoices was to assure that the Debtor continued to provide services to WMA.  GEC argues that there is no legal or factual basis for Capstone's claim that it was entitled to payment from WMA of the factored invoices before the Debtor's invoices could be paid.  The SCTS does not

9

explicitly instruct WMA to pay invoices in chronological order. (D.I. 225, Ex. R at 118 & Ex. S at 1-2.)  Nor do the PSAs or estoppel agreements require that WMA pay factored invoices before paying non-factored invoices.  (D.I. 170, Exs. A-F.)  Therefore, GEC argues that there is no basis for Capstone to argue that its earlier factored invoices had to be paid before WMA could pay the Debtor's later unfactored invoices.

Capstone disagrees.  It contends that under the STCS the Debtor was to process solid waste, for which WMA was to pay an annual fee in monthly installments.  (Id., Ex. R at 18, 100, 132.)  Capstone alleges that the payment history between WMA and the Debtor demonstrates that invoices for the services were to be paid chronologically.  It contends that "[i]t is unsupportable that WMA just happened to miss the payments that were properly owed to Capstone and was only able to make payments on the remaining, subsequent invoices" owed to the Debtor.  (D.I. 225 at ¶¶ 47-50.)

In support, Capstone filed numerous documents, including the declarations of the Debtor's former officers, Geoffrey Starin and Timothy Hodge.  (D.I. 230-1; D.I. 230-2.)  Both Starin and Hodge admit that WMA fell behind on payments due to Capstone in the second half of 2016 and that, nonetheless, between early September and early October 2016, WMA made direct payments totaling $170,461.66 (net of taxes) to the Debtor.  (Id. at ¶¶ 6-11.)  On October 21, 2016, Capstone learned that WMA had made

those payments and was in the process of authorizing an additional payment to the Debtor of almost $250,000. (D.I. 170, Ex. G.) In response, Capstone sent a letter to WMA and the Debtor demanding the turnover of those funds and instructing WMA to ignore any future instructions from the Debtor to have funds due to Capstone sent to the Debtor (the "First Notice"). (Id., Ex. H.) Upon receiving that letter, WMA promised via email that it would remit "all future payments . . . directly to Capstone." (Id., Ex. G at 1.)

Between October and December 2016, WMA did exactly that. Capstone received a series of payments from WMA during that period which totaled $852,327.89, and represented payment of its factored invoices dated March through June, 2016. (Proof of Claim 9, Ex. A.)

However, notwithstanding those assurances, in December and January WMA again began sending payments to the Debtor. WMA sent the Debtor payments totaling $47,500 in late December 2016 and early January 2017. (D.I. 225, Ex. Q at Check No. 19418; D.I. 230-1 at ¶ 8; D.I. 230-2 at ¶ 8.) On January 13, 2017, Capstone sent a second letter (the "Second Notice") to WMA and the Debtor asserting that those payments had improperly gone to the Debtors and should be immediately remitted to Capstone. (D.I. 170, Exs. J, K.) That same day, Capstone instructed the Debtor to wire to it another payment that WMA was to send later that afternoon; the

11

Debtor agreed to do so. (D.I 170, Ex. K at 1.) WMA did pay the Debtor an additional $47,500 on January 13, 2017. (D.I. 225, Ex. Q Check No. 19435; D.I. 230-1 at ¶ 10; D.I. 230-2 at ¶ 10.) However, the Debtor never forwarded those funds to Capstone. Instead, on January 30, 2017, the Debtor notified Capstone that it was unable to forward those funds to Capstone because they had been used to fund payroll and other critical expenses. (D.I. 170, Ex. L.)

Capstone argues that the above email exchanges with the Debtor's officers are an admission that the Debtor received and failed to forward misdirected payments. It further contends that those exchanges, and the other documents it provided, prove that the Debtor continued to divert funds that should have gone to Capstone.

GEC responds that the Debtor properly applied the payments it received to unfactored invoices due to it at the time. GEC notes that most of those payments specifically reference unfactored invoices and the one that does not (the 12/30/16 check) was still properly applied by the Debtor to an invoice dated December 1, 2016. GEC also relies on the Trustee's declaration to support its position. In his declaration, the Trustee states that his own records, the Debtor's documents, and documents obtained from WMA do not contain any evidence of misdirected payments. (D.I. 226-2.)

The Court does not find the Trustee's declaration probative. The Trustee's declaration merely states that he did not find any record showing that the Debtor received payment from WMA for or on account of any invoice that was sold to Capstone. (Id. at ¶ 13.) However, the payments at issue occurred well before the appointment of the Trustee and the declaration does not address the issue of whether the payments received by the Debtor should have been applied to the invoices factored to Capstone. (D.I. 74.)

The Court concludes that the January 13 and 30, 2017, correspondence from the Debtor are admissions by the Debtor that the $47,500 payment received on January 13, 2017, should have been forwarded to Capstone. The Court also finds that those admissions, and the other evidence presented, also support the conclusion that the $47,500 in payments made in the weeks prior to January 13, 2017, were also misdirected. (D.I. 170, Exs. K, L; D.I. 230-1; D.I. 230-2; D.I. 225, Ex. Q at Check No. 19435.)

When confronted by Capstone in January 2017, both WMA and the Debtor admitted that payments due to Capstone were being diverted. Upon receiving the First Notice, WMA promised that all future payments would be remitted directly to Capstone. (D.I. 170, Ex. G.) In addition, the Debtor admitted that the payments it had received from WMA following the Second Notice were misdirected funds properly owed to Capstone and that the Debtor

13

Case 1:16-bk-10005-MFW    Doc 234    Filed 07/16/21    Entered 07/16/21 15:11:38    Desc
Main Document    Page 14 of 17

should have forwarded the funds to it under the PSAs. (Id., Ex. K.) At no time did either the Debtor or WMA assert that WMA was free to pay the Debtor's invoices before it paid Capstone's invoices.

Further, the Court concludes that Capstone has proven that the Debtor received and failed to forward misdirected payments after January 2017. WMA's records reveal that after January 2017, WMA continued to skip paying the factored invoices due to Capstone, while paying the Debtor for later non-factored invoices. (D.I. 225, Ex. Q.) For example, after January 2017, WMA paid the Debtor for unfactored invoices dated December 2016 through June 2017 without submitting any payment to Capstone on its October and November 2016 invoices. (Id.)

The Court's conclusion that the Debtor misdirected funds due to Capstone is not surprising given the Debtor's behavior in the past. The Debtor began factoring invoices to Capstone <u>after</u> it had pledged the revenue due under the SCTS Contract to other creditors pursuant to a settlement agreement. (D.I. 56 at 5.) By factoring the invoices, the Debtor was able to receive 70% of their face value, without remitting anything to those creditors. (D.I. 51 at 147-48.)

For the forgoing reasons, the Court concludes that Capstone has proven that it has a claim totaling $332,147.11 for misdirected funds. Because the Court concludes that those funds

14

were misdirected, Capstone is also entitled to a claim of $49,822.07 as a 15% misdirection fee, for a total claim of $381,969.18.

     5.   <u>Secured Claim</u>

Capstone argues that its claim is a secured claim under the provisions of the PSAs. Under the PSAs, the Debtor granted Capstone a continuing security interest "[t]o secure the representations and covenants made by Seller [the Debtor] in this Agreement, but not the credit risk of the accounts . . . ." (D.I. 170, Exs. A-F at § 1.) Capstone filed a UCC-1 Financing Statement perfecting that security interest with the U.S. Virgin Islands Territory on July 15, 2015. (D.I. 225, Ex. T.) Capstone asserts that its entire claim is secured because it is based on the Debtor's misdirection of funds in violation of the PSAs and not simply based on the credit risk.

GEC counters that Capstone's failure to prove its claim is based on the Debtor's breach of representations or covenants made in the PSAs. GEC argues that Capstone accepted the credit risk of the factored invoices and therefore has no recourse against the Debtor or its assets.

As the Court found above, Capstone's claim is based on the breach of the Debtor's covenant under the PSAs wherein it agreed it "shall hold any [misdirected payments] in trust for the benefit of [Capstone], and shall pay over such monies . . .

within 2 business days of receipt thereof." (D.I. 170, Exs. A-F at § o.)  Therefore, the Court concludes that Capstone has established that its claim is a secured claim under the terms of the PSAs.  (Id. at § l.)  Further, the evidence shows that the misdirected funds received by the Debtor were in excess of Capstone's claim.  (D.I. 225, Ex. Q.)  As a result, the Court concludes that Capstone's entire claim of $381,969.18 is for misdirected payments and is therefore a secured claim.

GEC argues, however, that Capstone does not have any security interest in the Trustee's settlement with WMA because it was a settlement only of claims that the Trustee pursued or could have pursued against WMA.  (D.I. 191-1.)  Because the invoices factored to Capstone were no longer owed to the Debtor, GEC contends that the Trustee could not have sued on them.  It relies on the Trustee's declaration which states that he "did not seek payment for or on account of any [Debtor] invoice that had been sold and assigned to Capstone."  (D.I. 226-2 at 3.)

Capstone argues that the Trustee's settlement with WMA further supports its secured claim.  Capstone notes that the settlement is in full and complete satisfaction of claims arising from the services rendered by the Debtor under the SCTS Contract and, therefore, asserts that those settlement payments include amounts owed on the factored invoices, which were on account of the Debtor's performance under the SCTS.  (D.I. 191-1 at 4; D.I.

16

225 Ex. U at 4.)  It notes that the Trustee's complaint and settlement both reference the Trustee's claims for "factoring losses" incurred by the Debtor.  (D.I. 151 at 2; D.I. 191 at 2.)

The Court does not need to decide whether the Trustee sued on behalf of Capstone's factored invoices.  Even if the settlement funds only represent satisfaction of claims that the estate had against WMA, Capstone still has an allowed secured claim on all assets of the estate based on the UCC-1 financing statement it filed.  (D.I. 225, Ex. T.)

IV.  CONCLUSION

The Court concludes that Capstone has a secured claim for misdirected payments and fees under the PSAs in the amount of $381,969.18.

An appropriate Order is attached.

Dated: July 16, 2021                BY THE COURT:

                                    Mary F. Walrath
                                    United States Bankruptcy Judge